*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0190P (6th Cir.)
File Name: 02a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

          *v.*                                No. 00-5768

JEFFERY BENNETT,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-20230—Jon Phipps McCalla, District Judge.

Argued: March 19, 2002

Decided and Filed: May 30, 2002

Before: SILER and GILMAN, Circuit Judges;
HEYBURN, Chief District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Sarah C. Zearfoss, Ann Arbor, Michigan, for Appellant. Thomas L. Parker, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

———————————————

[*]The Honorable John G. Heyburn II, Chief United States District Judge for the Western District of Kentucky, sitting by designation.

**ON BRIEF:** Sarah C. Zearfoss, Ann Arbor, Michigan, for Appellant.    Thomas L. Parker, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.   On March 6, 2000, Jeffrey Bennett pled guilty, in accordance with a plea agreement, to one count of knowingly possessing and intending to distribute methamphetamine, or aiding and abetting such conduct.  Bennett has appealed his conviction and sentence, arguing that the district court erred in (1) accepting his guilty plea despite the absence of a factual basis for his guilt, (2) enhancing his offense level by four points for being "an organizer or leader" of a criminal activity involving five or more participants, and (3) failing to make sufficient factual findings to support its determination of the amount of methamphetamine for which Bennett should be held responsible.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Indictment and plea

A federal grand jury sitting in Memphis indicted Bennett on four counts of drug-related offenses in September of 1999. The indictment named nine unindicted coconspirators: Flavio Carlos Franco, Ricky Fuller, Leo Gonzales, Brandon Harris, Edgar Morales, Robert O'Neal, Joy Reems, Michael Wilson, and Jeffrey Young.  Two months later, Bennett pled not guilty to each of the four counts against him.  But on March 6, 2000, in accordance with a plea agreement entered into that day, Bennett changed his plea to guilty on Count Three of the indictment.  Count Three charged that on or about April 13, 1998, Bennett, aided and abetted by Brandon Harris and Jeffrey Young, "did unlawfully, knowingly and intentionally possess and cause the possession with the intent to distribute

and did distribute approximately 341.1 grams of a mixture and substance containing methamphetamine . . . in violation of Title 21, United States Code, § 841(a)(1) and Title 18, United States Code, § 2."

In exchange for Bennett's guilty plea on Count Three, the government agreed to drop the other three counts against him, and promised to make a non-binding recommendation to the district court "that the controlled substances and quantity should be greater than five (5) kilograms and not more than fifteen (15) kilograms of a mixture or substance containing methamphetamine." The plea agreement stated that Bennett had been "informed of the elements of the charges against him," and that "[b]y signing the agreement, [Bennett] admits that he was, in fact, guilty of the offense and that [he] will enter a guilty plea before the court." Nowhere in the agreement, however, were the elements of the offense to which Bennett was agreeing to plead guilty set forth. Nor did the agreement describe the factual basis for Bennett's commission of that offense.

At the guilty plea hearing on March 6, 2000, the district court asked Bennett if he had received and reviewed a copy of the indictment with his attorney. Bennett acknowledged that he had. The court then recited the terms of the plea agreement to Bennett, and Bennett answered affirmatively when asked if the court's recitation was correct. He was also questioned with respect to the voluntariness both of his signing the plea agreement and of his entering the guilty plea. Bennett agreed that he had not been coerced or otherwise forced to enter into the agreement.

The district court then read the indictment and described the elements of the crime. Bennett agreed that he understood the charge against him and the government's burden of proof. But the court did not specifically ask Bennett whether he had in fact engaged in conduct that would satisfy the elements of the crime charged in Count Three of the indictment.

Instead, the court requested that the government describe its case against Bennett. The Assistant U.S. Attorney offered an

account that included only three references to Bennett—that (1) on April 13, 1998, Bennett was seen driving a van belonging to Jeffrey Young, presumably conducting countersurveillance while Young negotiated a methamphetamine transaction with undercover law enforcement officers in Young's house; (2) the methamphetamine that the officers found in Young's garage on that occasion "came from Jeffrey Bennett;" and (3) "[w]hen Mr. Bennett was arrested in October of 1999, in Oregon, he admitted to the officers that he had been involved with a group of individuals in Memphis, Tennessee, and that he was involved in the distribution of methamphetamine." Following this recitation, the district court asked Bennett for his plea. Bennett responded "guilty." The plea was then accepted, and the parties next appeared before the court at the sentencing hearing on May 30, 2000.

## B.    Presentence report

Prior to the sentencing hearing, a Presentence Investigation Report (PSR) was prepared. The PSR recommended a base offense level of 36, consistent with Bennett's responsibility for 5 to 15 kilograms of methamphetamine, as well as a four-level enhancement for acting as "an organizer or leader" of a criminal activity involving five or more participants, and a three-level downward adjustment for acceptance of responsibility. Bennett filed a written response to the PSR, objecting to its recommendation of the four-level enhancement for his role in the offense, as well as to the base offense level of 36. He did not, however, object to the accuracy of any specific fact contained in the PSR. The parole officer who prepared the report therefore declined to respond to Bennett's objections on the ground that they were not sufficiently particularized.

As taken from the PSR, the following account describes the conduct surrounding Bennett's offense: Michael Wilson moved into the Memphis, Tennessee apartment of Ricky Fuller in October of 1997, where he joined Fuller in the storage and distribution of large quantities of

Bennett's written objection, which was in the record before the court at the sentencing hearing, the district court said nothing about the amount of methamphetamine attributable to Bennett.

The district court did not run afoul of Rule 32(c)(1), however, because Bennett waived his written objection at the sentencing hearing. After a lengthy discussion about whether Bennett should be considered "an organizer or leader" of the conspiracy for the purposes of the four-point enhancement, the court asked Bennett's counsel whether there was "anything else from defense counsel?" To this direct question from the court, Bennett's counsel replied, "Your Honor, we have no – we still have the objection to the four point enhancement." By failing to reiterate his objection to the base offense level when asked by the district court whether there was "anything else" that needed to be considered, Bennett waived his right to object to the amount of methamphetamine attributable to him. *See United States v. Barajas-Nunez*, 91 F.3d 826, 830 (6th Cir.1996) (holding that the government waived its ability to object to a downward departure when it failed to voice its objection in response to the district judge's question, at the close of the sentencing hearing, whether "there was anything else he should do with regard to the sentence"). At this point in the sentencing hearing, the amount of methamphetamine attributable to Bennett ceased to be a "controverted" sentencing matter under Rule 32(c)(1). The district court was therefore entitled to adopt the recommendation of the PSR regarding the amount of methamphetamine attributable to Bennett without making its own factual findings.

## III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

of one or more participants. For the above reasons, we conclude that the district court did not err in enhancing Bennett's sentence four levels pursuant to U.S. Sentencing Guidelines § 3B1.1(a).

**C. The district court did not err in failing to make specific factual findings regarding the amount of methamphetamine for which Bennett was responsible**

Bennett argues that the district court did not comply with the requirements of Rule 32(c)(1) of the Federal Rules of Criminal Procedure, because it failed to make specific factual findings regarding the amount of methamphetamine for which Bennett was responsible. The rule provides that

> [a]t the sentencing hearing, the court . . . must rule on any unresolved objections to the presentence report . . . . For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.

Fed. R. Crim. P. 32(c)(1). Rule 32(c)(1) "prohibits a court faced with a dispute over sentencing factors from adopting the factual findings of the presentence report without making factual determinations of its own." *United States v. Parrott*, 148 F.3d 629, 633 (6th Cir. 1998) (citation omitted). "The primary purpose for this rule is to ensure that sentencing is based on reliable facts found by the court itself after deliberation, not on the delegation of the factfinding process to the probation officer or the prosecution." *Id.* We require "literal compliance" with Rule 32(c)(1). *United States v. Tackett*, 113 F.3d 603, 613 (6th Cir. 1997).

Bennett's written objection to the PSR's recommended base offense level of 36 constituted an objection to the PSR's factual determination of the amount of methamphetamine attributable to him because, under U.S. Sentencing Guidelines § 2D1.1, the base offense level is arrived at solely on the basis of the amount of methamphetamine at issue. Despite

methamphetamine, marijuana, and cocaine. Following Fuller's arrest in December of 1997, Wilson collected narcotics debts on Fuller's behalf. Wilson was contacted around this time by a woman saying that Jeffrey Bennett, who had known Wilson since they worked together years earlier at a Memphis night club, wished to discuss some "unfinished business." Bennett, who was then living in Salt Lake City, Utah, came to Memphis to meet Wilson at a Memphis motel. At the motel, Bennett told Wilson that he was in town to collect Fuller's narcotics debts owed to Bennett as a result of their trade in methamphetamine. According to Wilson, Bennett wanted to collect his debts from people to whom he had supplied methamphetamine before one of Fuller's other associates could collect marijuana debts from the same people.

Bennett then convinced Wilson to travel back to Salt Lake City with him. In Salt Lake City, Bennett obtained from Leo Gonzales, Bennett's usual source, approximately five pounds of methamphetamine. Wilson and Bennett then drove to Memphis with the drugs. Bennett had distributed all five pounds by early February of 1998, at which point he drove back to Salt Lake City, where Wilson flew to meet him the following month. During Wilson's stay in Salt Lake City, Bennett obtained another three pounds of methamphetamine. He and Wilson then drove back to Memphis with the drugs. After distributing these three pounds later in March, Bennett returned to Salt Lake for additional methamphetamine.

But on this trip, for a reason not explained in the record, Bennett found that he was unable to get methamphetamine from Gonzales as he had previously done. Instead, he told Wilson that they would have to go to California to find more. Bennett and Wilson then traveled to Hesperie, California, where they obtained thirteen pounds of liquid methamphetamine from Gonzales. The two men returned to Memphis with the methamphetamine, where, according to Wilson, Bennett gave two pounds to Jason Hawks, two pounds to Robert O'Neal, two pounds to Brandon Harris, and one pound to Wilson. The remaining six pounds were taken

to a storage unit that had been rented by Tabitha Harbin, Harris's girlfriend.

In April of 1998, Shelby County Sheriff's officers purchased 27.6 grams of methamphetamine from Jeffrey Young, who had received the product from Harris. They also seized methamphetamine from the homes of Young and Robert Ryan Vance. Vance told the officers that he had received the product from Wilson, who was arrested after officers searched his residence and found two kilograms of methamphetamine, a firearm, and a small amount of marijuana.

Bennett was arrested over a year later in Jackson County, Oregon. Although the PSR does not explain the circumstances of Bennett's arrest, or how the 1998 arrests of his associates in Memphis might have led to Bennett, it states that Bennett had "left town to avoid arrest." The PSR does, however, contain several statements that Bennett made to the arresting federal agents after he had been read his *Miranda* rights, including the following exchange:

Bennett said Memphis got everyone but him . . . . The defendant asked a special agent if he knew what the weight was. The special agent indicated he did not and that the charges were for conspiracy and possession. The defendant replied, "I guess its got to be 10 or 20 pounds, huh?" Bennett said, "If you look back now, I would switch cars and shirts every day and never get caught. I just had to get paid, you know." He also said, "I wasn't good at much, but I could sell the shit out of dope. Coast to coast, like butter on toast." The defendant indicated his dope was never bad and that "I got anything you want, yellow, white, brown, kibbles." . . . When asked the best way to transport drugs on the interstate, the defendant said "you would want three cars." The defendant said the first car would have "a black guy driving with a lot of gold chains." The middle car would have "a clean cut white guy driving in a suit with several suits hanging in the back seat," and a third car to follow

organizer or leader" does not typically "delegate negotiation and price-setting authority to his underlings while relegating himself the much riskier task of driving around the neighborhood, looking for law enforcement agents who were looking for countersurveillants."

On the other hand, the PSR and the testimony of Wilson describe Bennett as recruiting Wilson to collect drug debts, and making trips to Utah and California to procure methamphetamine. "Recruitment of accomplices" is one characteristic of "an organizer or leader" listed in the comments to § 3B1.1. U. S. Sentencing Guidelines Manual § 3B1.1 cmt. n.4. Bennett contends that he did not recruit Wilson for the purposes of § 3B1.1(a) because Wilson had already been involved in the drug trade through Ricky Fuller. But nothing in the Guidelines suggests that "recruitment of accomplices" is significant only when the accomplice is convinced to break the law for the first time. Bennett took the initiative in seeking out Wilson as a partner in his methamphetamine trade and, as a result of Bennett's efforts, Wilson became involved with larger quantities and new lines of supply. The influence Bennett exercised over Wilson in organizing trips to Salt Lake City and California to procure methamphetamine shows that Bennett acted as the organizer of Wilson's activities.

Bennett is also described in the PSR as organizing the procurement in California, the transport to Memphis, and the repackaging and distribution there of a thirteen-pound quantity of methamphetamine. Both the PSR and Wilson's testimony at the sentencing hearing support the finding that Bennett was "in charge" of distributing this quantity, and of exercising management and control over four other participants when he allocated it among Hawks (two pounds), O'Neal (two pounds), Harris (two pounds), and Wilson (one pound), before the remaining six pounds were taken to a storage unit. These instances of Bennett's organizational initiative and management power are such that it was not clearly erroneous for the district court to determine that Bennett was "an organizer or leader" of the criminal activity

699 (6th Cir. 2000). "Whether these facts warrant a sentence enhancement pursuant to § 3B1.1(a)," however, "is a legal conclusion subject to de novo review." *Id.*

### 2.    *Bennett's status as "an organizer or leader"*

A "participant" is defined in the application notes to § 3B1.1 as one "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.1. Bennett was indeed engaged in criminal activity that involved at least five such participants, including Bennett himself, Leo Gonzales (Bennett's supplier in Utah and California), and Brandon Harris, Jason Hawks, Robert O'Neal, Michael Wilson, and Jeffrey Young (Bennett's Memphis associates). Application Note 2 of the Commentary to § 3B1.1 provides:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of *one or more other participants*. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U. S. Sentencing Guidelines Manual § 3B1.1 cmt. n.2 (emphasis added). Bennett, therefore, need not have been "an organizer or leader" of all four of the other participants, but only of one of them.

With the exception of Gonzales, who appears from the PSR to have functioned consistently as Bennett's supplier, the roles of the other participants were fluid. Bennett in fact did not always act as "an organizer or leader." As an example of his low-level functioning, Bennett points out that the government's offer of proof at the guilty plea hearing described Bennett driving a van, conducting "countersurveillance" while Jeffrey Young negotiated a transaction with undercover officers. Bennett argues that "an

the second. When asked which gang he sided with, the defendant said he was with the "Gangster Disciples" in Memphis, TN and the "Crips" in Dallas, TX. Bennett said he lived in three (3) different states and that was how he never got caught. When asked if he was ever scared of getting caught, Bennett said, "There was no way I was going to get caught. I had the number one system." The defendant was asked if he made the decisions in his "clique," Bennett said, "They're all going to say that. I can't say that." . . . Bennett told special agents that he used to hide dope in the dash of rental vehicles and was never caught. Bennett said, "Five or six guys are going to say that I was the man." He also said, "Back then, if you guys came, I would have shot you. I had an AR 15."

Separately, in a post-arrest interview with a probation officer, Bennett acknowledged his guilt as to Count Three of the indictment. Bennett said that he had met Leo Gonzales in California, who gave him the thirteen pounds of methamphetamine, which Bennett "placed in a stereo, dog proofed, and brought to Memphis on a train." Bennett explained that he and Mike Wilson handled the drugs, and that after Wilson got into trouble, Bennett "left that lifestyle."

### C.   Sentencing

At the May 30, 2000 sentencing hearing, the government called Michael Wilson, who had previously been convicted of conspiracy to distribute methamphetamine, and who was a key source of the information in the PSR. In addition to confirming the facts contained in the PSR, Wilson explained that Bennett directed the distribution of the thirteen-pound quantity of methamphetamine in the spring of 1998, collected the money from its distribution, and then wired the proceeds back to his source. Wilson was asked by the court whether Bennett was "in charge at some point in time." He replied that "[Bennett] was in charge at the initial—at the initial thirteen pounds there, he was in charge of it." Agreeing on cross-examination that Bennett "didn't organize [him] into

dealing drugs," Wilson said that he was already doing so through other suppliers when he met Bennett in April of 1997. Wilson also said that "he worked for himself," and that after Bennett "fronted" him the methamphetamine, Wilson sold it to his customers without direction from Bennett.

Bennett did not reiterate his written objection to the PSR's recommended base offense level at the sentencing hearing, although his objection was in the record before the district court. The court found that he was "an organizer or leader" of drug-trafficking activity involving several other people, resulting in a four-level enhancement. It also found that Bennett had accepted responsibility for his criminal conduct, resulting in a three-level downward adjustment. After accounting for the enhancement and the downward adjustment, the district court arrived at a final offense level of 37. The court thereby implicitly adopted the PSR's recommended base offense level of 36 without having made any factual findings, or any comments at all, regarding the amount of methamphetamine for which Bennett should be held responsible. Bennett was then sentenced to the low end of the appropriate guideline range, which was 210 months of imprisonment. The district court entered its judgment on May 31, 2000, one day after the sentencing hearing. This appeal followed.

## II. ANALYSIS

**A.    The district court did not err in entering judgment on Bennett's guilty plea**

### 1.    *Rule 11(f) of the Federal Rules of Criminal Procedure*

Bennett argues that the district court erred in accepting his guilty plea because it lacked a basis in fact as required by Rule 11(f) of the Federal Rules of Criminal Procedure. Rule 11(f), however, does not concern the acceptance of a guilty plea. Instead, the Rule provides that "*Notwithstanding the acceptance of a plea of guilty*, the court should not *enter a judgment* upon such a plea without making such inquiry as

recruiting Wilson to partner with him in the methamphetamine trade, traveling from Memphis to Utah and California for the express purpose of obtaining methamphetamine, and then returning to Memphis in order to distribute the drug. The PSR contains several statements made by Bennett to government agents at the time of his arrest, wherein he boasted about his ability to sell drugs and his sophistication in concealing his activities. Wilson testified at the sentencing hearing that, in the spring of 1998, Bennett divided a thirteen-pound quantity of methamphetamine among several associates in order that it be distributed, and that Bennett collected debts from its sale. From these and other facts contained in the PSR and in Wilson's testimony, the district court could easily have inferred that Bennett had the required mental state to have knowingly possessed methamphetamine with the intent to distribute it. So despite the fact that the district court's plea colloquy pursuant to Rule 11(f) was far from the "ideal means" under *Tunning*, 69 F.3d at 112, we conclude that the court did not abuse its discretion in entering judgment against Bennett on May 31, 2000.

**B.    The district court did not err in enhancing Bennett's sentence based upon its conclusion that Bennett was "an organizer or leader" of the criminal activity**

### 1.    *Standard of review*

Bennett argues that the district court erred in enhancing his sentence pursuant to U.S. Sentencing Guidelines § 3B1.1(a), which provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." (Emphasis in original.) The government must establish the facts supporting the enhancement for a defendant's aggravating role in an offense by a preponderance of the evidence. *United States v. Gibson*, 985 F.2d 860, 866 (6th Cir. 1993). We will reverse a district court's factual findings regarding the defendant's role in a conspiracy only if they are clearly erroneous. *United States v. Hernandez*, 227 F.3d 686,

*the other vehicle, the van, Jeffrey Bennett was driving that vehicle.*  The officers ultimately conducted a search of Jeffrey Young's house, and at that time, they found approximately three hundred grams of methamphetamine in the garage area of his residence.  That is gross weight, Your Honor.  There were some smaller quantities of methamphetamine found in his residence, but roughly, if memory serves, Your Honor, the net weight of the methamphetamine in the garage was somewhere in the two hundred and fifty gram range. *The proof would have shown that the methamphetamine found in the garage came from Jeffrey Bennett.  When Mr. Bennett was arrested in October of 1999, in Oregon, he admitted to the officers that he had been involved with a group of individuals in Memphis, Tennessee, and that he was involved in the distribution of methamphetamine.*

(Emphasis added.)

The italicized passages represent the only information in the offer of proof that directly implicates Bennett.  Although Bennett could have been driving Jeffrey Young's van innocently, and the methamphetamine that was traceable to Bennett does not establish his knowledgeable possession because he might have possessed it unwittingly, his admission that he "was involved in the distribution of methamphetamine" constitutes evidence of his intent to distribute and might permit an inference of his knowledgeable possession.  We need not, however, decide this last question in light of the evidence contained in the PSR.

Even assuming for the sake of argument that Bennett's knowledge and intent were not supported by the government's offer of proof at the guilty plea hearing, a sufficient factual basis to support his plea under Rule 11(f) clearly existed by the time of the sentencing hearing.  The factual record at Bennett's guilty plea hearing was supplemented at the sentencing hearing by the PSR described in Part I.B. above, as well as by the testimony of Michael Wilson, described above in Part I.C.  Specifically, the PSR shows Bennett

shall satisfy it that there is a factual basis for the plea." Fed. R. Crim. P. 11(f) (emphasis added).  A sufficient factual basis for Bennett's guilty plea, therefore, must have been present by the time of his sentencing, when judgment was entered, and not, as Bennett contends, at his guilty plea hearing.

### 2.    *Standard of review*

We will reverse a district court's decision regarding whether a guilty plea meets the requirements of Rule 11 of the Federal Rules of Criminal Procedure if the district court abused its discretion. *United States v. Badger*, 2001 WL 1450786, at *2 (6th Cir. Nov. 2, 2001) (unpublished table decision).  Although "Rule 11(f) does not provide any guidance concerning the steps a district court should take to ensure that a factual basis exists," *United States v. Baez*, 87 F.3d 805, 809 (6th Cir. 1996), "the need to have some factual basis [is] subject to no exceptions." *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) (internal quotation marks and citation omitted).  "[T]he lack of a sufficient factual basis for a plea [under Rule 11(f)] can never be harmless error." *United States v. Williams*, 176 F.3d 301, 313 (6th Cir. 1999).

### 3.    *The factual basis for Bennett's guilty plea*

Bennett pled guilty to a violation of, or aiding and abetting the violation of, 21 U.S.C. § 841(a)(1), which provides that "it shall be unlawful for any person knowingly or intentionally . . . to . . . possess with intent to . . . distribute . . . a controlled substance."  The elements of this offense are that "(1) the defendant knowingly; (2) possessed a controlled substance; (3) with intent to distribute." *United States v. Gibbs*, 182 F.3d 408, 424 (6th Cir. 1999).  "To prove aiding and abetting, the government must show that [the defendant] knew that the principals possessed [the controlled substance] with the intent to distribute it, and that [the defendant] assisted in their plan to deliver [it]." *United States v. Ledezma*, 26 F.3d 636, 641 (6th Cir. 1994).  Bennett's mental state is thus an essential element of the offense to which he pled guilty.  It is this element that Bennett claims was unsupported by the facts, because the district court neglected

to ask Bennett directly whether he had the requisite knowledge and intent.

The only direct evidence of a defendant's mental state "would be the defendant's own statement as to what he was thinking." *United States v. Tunning*, 69 F.3d 107, 113 (6th Cir. 1995). Unfortunately, the district court did not ask Bennett about his knowledge and intent. The district court's failure to do so, however, is not fatal to the effectiveness of Bennett's guilty plea. As this court held in *Tunning*,

> [t]he ideal means to establish the factual basis for a guilty plea is for the district court to ask the defendant to state, in the defendant's own words, what the defendant did that he believes constitutes the crime to which he is pleading guilty. So long as the district court ensures that the defendant's statement includes conduct—and mental state if necessary—that satisfy every element of the offense, there should be no question concerning the sufficiency of the factual basis for the guilty plea. This "ideal" method is by no means the only method, however. We recognize that the district court may determine the existence of the Rule 11(f) factual basis from a number of sources, including a statement on the record from the government prosecutors as well as a statement from the defendant.

*Id.* at 112 (internal quotation marks and citation omitted).

Bennett's mental state, therefore, may be supported to the satisfaction of Rule 11(f) by circumstantial evidence establishing his knowledge and intent. But "a bare statement from the prosecutor that he would have proven that the defendant acted with the [requisite] intent" is not sufficient to support a guilty plea under Rule 11(f). *Id.* at 114 (holding that the defendant's guilty plea was not supported by a sufficient factual basis under Rule 11(f), because the government attempted to demonstrate the factual basis for the defendant's intent based on "bare assertions . . . that *evidence at trial* would have established certain facts" without "any

indication of *what evidence* supports those facts") (emphasis in original).

Because the district court did not elicit from Bennett the facts underlying his plea at the March 6, 2000 guilty plea hearing, the only facts before the court in support of Bennett's plea at that time were those contained in the plea agreement and the government's offer of proof. The plea agreement itself contained no facts supporting the plea, but the government's offer of proof consisted of the following statement:

> Prior to April 13, 1998, the proof would have shown that the defendant Jeffrey Bennett obtained methamphetamine in Utah or California, brought the methamphetamine to Memphis, Tennessee, and sold it to persons, including Brandon Harris, Michael Wilson and Jeffrey Young.

> On April 13, 1998, the Shelby County Sheriff's Office here in Memphis, Shelby County, Tennessee conducted an undercover operation which led to the search and arrest, the search of Jeffrey Young's house at 1278 Dogwood and to his arrest. On that date, Dee Bowling acting as an undercover negotiated for sale or purchase of between one and three pounds of methamphetamine. At one time, the discussion centered around approximately one pound of methamphetamine and at another time they discussed three pounds, but, ultimately, Your Honor, the deal was for roughly one pound.

> During the course of that operation, Mr.—Officer Bowling met with Jeffrey Young at that residence, along with another officer acing in an undercover capacity who showed a quantity of money to Mr. Young to show that they could, in fact, purchase what they were asking for. During the course of that operation, there was [sic] several Shelby County Sheriff's officers in the area conducting surveillance. And during that operation, the officers observed several vehicles, including a Cadillac and a Mitsubishi van, and the van belonged to Jeffrey Young. In one of those vehicles was Brandon Harris. *In*