RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DEMETRIUS N. PITTS,

*Defendant-Appellant*.

No. 20-3238

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cr-00035-1—Solomon Oliver, Jr., District Judge.

Decided and Filed:  May 14, 2021

Before:  STRANCH, LARSEN, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Steven R. Jaeger, THE JAEGER FIRM PLLC, Erlanger, Kentucky, for Appellant.
Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

NALBANDIAN, Circuit Judge.  The government charged Defendant Demetrius Pitts
with serious offenses including planning terrorist attacks against his fellow Americans and
threatening the President.  The parties ultimately agreed to resolve this case with a plea
agreement that carried a 168-month sentence, which was substantially below what the sentencing
Guidelines recommended.  Pitts now challenges that resolution.

The FBI began monitoring Pitts after he made social media posts encouraging Muslims to pursue military training.  Eventually, Pitts expressed a desire to meet with an al-Qaeda operative, and the FBI deployed an undercover agent ("UA") to play this role.  The two planned a bombing in downtown Cleveland, and the FBI arrested Pitts after he pitched follow-up attacks in Philadelphia and San Francisco.

Ultimately, the government charged Pitts with attempting to provide material support or resources to a foreign terrorist organization ("FTO"), threatening the President, threatening the President's immediate family, and making false statements to law enforcement.  Pitts pleaded guilty to the first three charges, and the government dismissed the fourth.  He now complains that the district court improperly accepted his plea because there was no factual basis for it in the record, because he was not competent to enter it, and because he did not understand its terms. Because we find these arguments meritless, we don't address the sentencing arguments barred by the appellate waiver in Pitts's valid plea agreement, and we **AFFIRM** the district court.

I.

Pitts often expressed extremist views on social media.  On New Year's Eve in 2015, he sent a short Facebook message to a talk show in California:  "Fuck America and there arm forces.  The USA will be destroy.  Allahu Akbar."  (R.40, Presentence Investigation Report ("PSR"), at PID#201 (alteration omitted).)  In 2017, Pitts commented on pictures law enforcement believed to be from a jihadist training camp.  He wrote that Muslims everywhere needed to begin engaging in similar military-style training and expressed a desire to recruit others to kill Americans.

The FBI began actively investigating Pitts.  This surveillance revealed that, while discussing the comparative strengths of al-Qaeda and the Islamic State of Iraq and Syria ("ISIS"), Pitts preferred al-Qaeda, which he perceived as more structured.  He also expressed a desire to train with al-Qaeda overseas, return to the U.S., and conduct a terrorist attack.  The United States designated al-Qaeda an FTO back in 1999.  It has never lifted that designation.

Pitts eventually expressed an interest in meeting al-Qaeda agents.  So the FBI deployed a UA, who pretended to be one.  In April 2018, Pitts told the UA that he wanted to harm U.S.

military members.  In a recorded conversation, he explained exactly how he'd do it:  "I told you my favorite thing is head, hand, hand. . . . You take the head and the t[wo] hands and that's how you make your statement.  You send it straight to 'em.  The person's head and his . . . two hands.  And they know right off the bat, boy these people ain't playing."  (R.40, PSR, at PID#201.)  He assured the UA that he wasn't "scared to do it" and expressed an interest in mutilating President Donald Trump this way.  (*Id.*)  He similarly threatened the President's daughter and son-in-law.

At a later meeting, the UA and Pitts discussed conducting an attack during Cleveland's Fourth of July parade.  Pitts was interested, and the two discussed the United States Coast Guard facility in Cleveland as a potential target.  A second UA ("UA2") provided Pitts with a cellphone, to identify potential targets, and a metro card, to navigate the city.  Pitts went to Cleveland, where he took pictures and videos of St. John's Cathedral, Cleveland Harbor, and the Rock & Roll Hall of Fame.  The UA told Pitts that returning the cell phone would "seal the deal" and let al-Qaeda know he was "for real."  (R.40, PSR, at PID#202.)

Pitts slid a map of Cleveland's metro system across a diner table to UA2 at their next meeting.  He'd hidden the cell phone inside it.  He later told the UA that he'd sworn an oath of allegiance to al-Qaeda, which he'd recorded on the phone.  Forensic investigation revealed two such videos.

Pitts later described how he saw his role in their plot.  "My part is just to go scope, get the information we need, and bring it back."  (R.1-1, Wilson Aff., at PID#23.)  This logistical support next required Pitts to get a vehicle that could house and move explosives.  After conducting some initial research, Pitts and the UA discussed which types of cars were least likely to arouse suspicion from law enforcement and how to get a vehicle without using any identification.

The UA told Pitts that their attack on Cleveland was set before the pair decided on a car.  He reiterated that they would be conducting the attack on behalf of al-Qaeda, which Pitts acknowledged before expressing an interest in traveling to Philadelphia or San Francisco to scout locations for a second attack.  Pitts asked to meet the UA in person to discuss his thoughts further.

To their last meeting, Pitts brought a map of Philadelphia, and the UA brought a remote-control car. Pitts had highlighted Philadelphia's city hall and its federal building as ideal targets. He said filling a truck with explosives, like in the Oklahoma City bombing, would cause the most damage. The UA then showed Pitts a remote-controlled car filled with explosives and BB's. Pitts thought that the car could slip past law enforcement undetected. He then suggested ways to maximize the damage done, either by replacing the BB's with shrapnel or by making multiple cars and gifting them to the children of military personnel.

This meeting ended when the FBI arrested Pitts. During law enforcement's initial interrogation, Pitts refused to tell them what he knew about a potential July 4th attack in Cleveland and denied any terrorist activity.

Pitts appeared in court the next day. He told the court that he understood his rights and accurately relayed his biographical information. When the magistrate judge asked if he had "had sufficient time to review [the complaint and supporting affidavit]," Pitts said he had "reviewed it but not had time to discuss it with" his attorney yet. (R.65, Initial Appearance, at PID#463.) The prosecutor stated that the complaint charged Pitts with attempting to provide material support or resources to an FTO. Pitts said he understood the charge.

About three weeks after the initial appearance, defense counsel moved the court to order a psychiatric/psychological examination and report on Pitts's competency to stand trial. Counsel said he'd learned Pitts "has longstanding mental health issues and that he is presently prescribed medications for the same." (R.12, Motion for Competency Examination, at PID#48.) The prosecution did not oppose the motion.

That report declared Pitts competent. (R.18, Mental Health Evaluation of Demetrius Pitts, at PID#81.) But it also explained that Pitts had suffered a severe stroke in 2013 that hospitalized him for about a year. He was wheelchair-bound for at least some of his recovery. Since the stroke, he has continued to live with blindness in his left eye and weakness in the left side of his body. At the time of his arrest, he resided in a nursing facility. Plus, Pitts said that he'd taken six medications at various times to treat schizophrenia, bipolar disorder, and depression. And he reported multiple suicide attempts.

Despite these conditions, the report concluded that Pitts "demonstrated a thorough understanding of the court process, his criminal charges, and possible consequences of prosecution and conviction." (R.18, Mental Health Evaluation of Demetrius Pitts, at PID#76.) His evaluation spanned three months, and during this time he successfully navigated the prison to keep his appointments and remembered earlier conversations. When he spoke with his evaluator, he conveyed an understanding of the charges against him, an ability to recall his actions leading up to his arrest, and a willingness to help his lawyer prepare a defense. Although the psychologist determined that Pitts suffered from antisocial personality disorder and cannabis use disorder, she concluded that he was competent.

At the competency hearing, neither Pitts, his attorney, nor the prosecutor objected to the report's conclusion that Pitts was competent. So the magistrate judge adopted the report's conclusion orally and in a written opinion. The district court adopted this conclusion too.

At Pitts's first arraignment, he pleaded not guilty. When the magistrate asked him if he'd read his indictment, Pitts asked the court to pause while he located his copy. And, after saying he understood the charges against him, he waived his right to have the indictment read in open court.

Then came Pitts's first change-of-plea hearing. The transcript makes clear that Pitts was alert throughout the proceeding. When it came time to swear Pitts in, he requested a Qur'an rather than a Bible. He recounted his biographical information and medical history. And he acknowledged that the purpose of the proceedings was for him to plead guilty.

So the district court began the plea colloquy. Pitts agreed that he'd discussed the indictment and plea agreement with his attorney before signing the plea agreement. But he was not a passive observer; Pitts stopped the court at least six times to get more clarification: twice when the judge said he would not review every provision of Pitts's plea agreement with him, once for an explanation of his sentencing Guidelines range, twice to protest the plea agreement's appellate waiver, and then, critically, to deny that he'd attempted to provide material support to al-Qaeda.

Twice, Pitts complained about his plea agreement's appellate waiver.  Pitts said he didn't understand what the district court meant when it said his plea agreement waived most of his direct appeal rights.  And after the district court explained to Pitts that he'd be "waiving most of your rights to appeal," Pitts protested, "I want them rights."  (R.60, First Change-of-Plea Hr'g, at PID#383.)  A long discussion between Pitts, the district court, and the prosecutor followed, during which the district court explained that Pitts's ability to appeal would be limited to sentences above the statutory maximum and to substantive-reasonableness challenges.  Pitts would also retain his ability to challenge his sentence for prosecutorial misconduct or ineffective assistance of counsel.  After this explanation, the court told Pitts, "I'm just trying to make sure you understand . . . you waived those other rights we talked about," and Pitts responded, "I understand."  (*Id.* at PID#387.)

With the precise terms of his appellate waiver cleared up, the hearing turned to Pitts's admission of his criminal conduct.  Things quickly broke down.  When the court tried to ask Pitts if he had attempted to assist al-Qaeda, Pitts cut the court off with a declarative "No."  (*Id.* at PID#388.)  Pitts explained:  "No, because the undercover never said he was al-Qaeda or nothing like that.  He said he was a Muslim brother. . . . He never said what organization or nothing like that."  (*Id.* at PID#388–89.)  Pitts denied an intent to assist al-Qaeda at least four more times. (*Id.* at PID#389 ("No interest"); *id.* ("No.  I was just responding [to] what he was talking about."); *id.* at PID#390 ("I don't know nothing about no al-Qaeda."); *id.* at PID#390–91 ("He never said nothing about al-Qaeda.  He just said Muslim brothers.  He never specifically came out and said al-Qaeda.").)  So the district court refused to take Pitts's plea:  "I'm not taking this plea.  I can't take a plea when a person is adamant [that] [t]hey don't even know anything about the organization or group."  (*Id.* at PID#391.)

After the initial change-of-plea hearing, the government filed a superseding indictment, requiring Pitts to appear at a second arraignment.  The superseding indictment retained the original count for attempting to provide material support or resources to an FTO.  But the government added charges for threatening the President and the President's immediate family as well as for making false statements to law enforcement.  The magistrate judge asked Pitts several questions about whether the medications he was taking prevented him from understanding the

proceedings or assisting his attorney, and Pitts answered each of them negatively. Pitts told the court that he had not received a copy of the new indictment before arraignment, and the magistrate judge recessed the court for several hours while Pitts and his attorney reviewed the document. After this break, the prosecutor read the superseding indictment into the record, Pitts pleaded not guilty, and the magistrate judge adjourned the proceedings.

The parties then negotiated a second plea agreement, and so the district court held a second change-of-plea hearing. Pitts said the medication he was taking made him sleepy but that he was clear-headed for the proceedings. The court confirmed that Pitts had reviewed both the superseding indictment and relevant plea agreement with his attorney. Pitts said he had. So the district court began to explain to Pitts the maximum penalties he was facing. He briefly confirmed that Pitts understood the negotiated sentence, which Pitts did. The prosecutor then explained that Pitts faced a thirty-year sentence, including twenty years for attempting to provide material support or resources to an FTO, five for threatening the President, and five for threatening the First Family.[1]

But when the court found that the appropriate Guidelines range called for a sentence of 360 months to life, Pitts interjected. He didn't understand how a life sentence was possible when his highest statutory maximum was only for twenty years. In response to Pitts's question, the district court asked the prosecutor, "the real range is what?" (R.72, Second Change-of-Plea Hr'g, at PID#610.) After she explained that there was a disconnect between the Guidelines and the statutory maximums, and that Pitts was correct that he couldn't receive a life sentence, the judge told Pitts he was "right on that" and had asked a "[v]ery good question." (*Id.* at PID#611.) In any event, the parties had stipulated to a 168-month sentence.

In return for the reduced sentence, Pitts gave up certain appellate rights. The plea agreement reserved his right to appeal a sentence above the statutory maximum or above the agreed-to 168 months, and his right to pursue claims for ineffective assistance of counsel, or for prosecutorial misconduct. Pitts responded affirmatively when the district court asked if he understood those grounds for appeal.

---

[1]The government requested that the district court dismiss the charges for making false statements to law enforcement, which it did at sentencing.

The parties moved on to the factual basis for Pitts's crimes. Part of Pitts's plea agreement was a narrative description of what the government and Pitts agreed the government could prove at trial. Addressing the court, Pitts admitted that he made the threats and other statements attributed to him but expressed frustration that "it just came up in a conversation. It's not like I initiated the conversation, but I do admit that I said then – I commented and reacted on and said words that I shouldn't have said." (R.72, Second Change-of-Plea Hr'g, at PID#619.) The district court also ensured Pitts agreed with the conduct described in his plea agreement:

> The Court: I'm not asking you about all of the details that might exist in regard to the crime, really just trying to make sure that you agree with the facts that constitute the crimes because you're pleading guilty to them. You understand that?
>
> The Defendant: Yes.
>
> The Court: And you did read that statement?
>
> The Defendant: I read it.
>
> The Court: You signed off on that statement?
>
> The Defendant: Yes, I did.[2]
>
> The Court: Okay. And you did that after you talked with [your attorney], right?
>
> The Defendant: We had a talk.
>
> The Court: And so you – you agree with to the fact[s] that you signed off on; is that right?
>
> The Defendant: Yes, sir.

(*Id.* at PID#619–20.) The district court subsequently confirmed Pitts intended to plead guilty after Pitts began expressing frustration with the factual basis:

> The Court: I'm not going through all the details but you – you do admit, I think you came here to admit --
>
> The Defendant: I admit.
>
> The Court: You committed the crimes, right?
>
> The Defendant: Yes I admit, sir.
>
> The Court: Counts 1, 2 and 3, you committed those crimes, right?
>
> The Defendant: Yes, sir.

---

[2]Pitts signed and dated his plea agreement, on top of initialing every page.

The Court:  All right.

The Defendant: That's all – I was just wondering.  You know what – yeah, I admit.

(*Id.* at PID#623–24.)  Both attorneys stated that they thought the hearing complied with Rule 11, Pitts pleaded guilty, and the district court accepted Pitts's plea.

Sentencing was the last proceeding below.  Pitts's attorney said Pitts had helped him prepare objections to the Presentence Investigation Report ("PSR").  And when the district court stated that the applicable Guidelines range was "360 months to life imprisonment," Pitts again objected that a life sentence was impossible given that his statutory maximums only totaled thirty years.  (R.68, Sentencing, at PID#493–94.)  During his allocution, Pitts complained that he was "not a terrorist" and not "part of [any] organization."  (*Id.* at PID#512–13.)  But when the court asked if Pitts stood by the plea agreement's description of his conduct, Pitts said he did.  So the district court sentenced Pitts to the predetermined 168 months.

As the hearing wrapped up, the prosecutor remarked that Pitts had waived most of his appellate rights, which prompted Pitts to say he didn't want to do that.  The judge walked Pitts through the appellate rights he had preserved, and Pitts's attorney agreed to counsel Pitts about whether to file a notice of appeal.

## II.

Pitts's appeal boils down to two claims.  First, he argues that the district court erred when it accepted his guilty plea.  Second, he argues that his sentence was procedurally unreasonable because the district court incorrectly stated the maximum sentence.  Because his guilty plea waived his right to challenge his sentence's procedural reasonableness, we will only consider the second argument if we find Pitts's first argument convincing.

## III.

### A.

Pitts argues that his plea agreement is invalid.  Although his brief presents them as a monolith, we understand Pitts to be making three distinct arguments.  First, there is no factual

basis for his plea in the record.  Second, he was incompetent to enter a plea agreement altogether.  Third, he did not knowingly enter his plea agreement because he did not understand the government's charges or his appellate waiver.  We address the factual basis argument first.  We next address Pitts's competency.  If a defendant is not competent to enter a guilty plea, it makes no sense to inquire into whether he knowingly entered the same.  *Godinez v. Moran*, 509 U.S. 389, 400–02 (1993).

*Factual Basis*.  "Before entering judgment on a guilty plea, the [district] court must determine that there is a factual basis for the plea."  Fed. R. Crim. P. 11(b)(3).  We review this alleged violation of Rule 11, which Pitts's attorney did not raise before the district court, for plain error.  *United States v. Mobley*, 618 F.3d 539, 544 (6th Cir. 2010) (citing *United States v. Lalonde*, 509 F.3d 750, 757 (6th Cir. 2007)).  Pitts bears the burden of proof and "must show that there is (1) error, (2) that is plain, and (3) that affects substantial rights.  If all three conditions are met, an appellate court may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or reputation of judicial proceedings."  *Lalonde*, 509 F.3d at 759 (quoting *United States v. Murdock*, 398 F.3d 491, 496 (6th Cir. 2005)).

The factual basis requirement "ensure[s] the accuracy of the plea through some evidence that a defendant actually committed the offense."  *Mobley*, 618 F.3d at 545 (quoting *United States v. McCreary-Redd*, 475 F.3d 718, 722 (6th Cir. 2007)).  The record need not reflect the factual basis for the plea agreement when the defendant enters his plea so long as there is a factual basis in the record when the district court enters judgment.  *United States v. Bennett*, 291 F.3d 888, 894 (6th Cir. 2002) (interpreting a previous version of Federal Rule of Criminal Procedure 11).  "In reviewing whether a district court had a factual basis for a plea, then, 'we may examine the entire record, including proceedings that occurred *after* the plea colloquy.'"  *Mobley*, 618 F.3d at 545 (quoting *McCreary-Redd*, 475 F.3d at 722 n.1).  Thus, sentencing proceedings and record documents may contribute to or provide a plea agreement's factual basis.  *See Bennett*, 291 F.3d at 896–97.

The district court can establish a factual basis in various ways.  "The ideal means to establish the factual basis for a guilty plea is for the district court to ask the defendant to state, in the defendant's own words, what the defendant did that he believes constitutes the crime to

which he is pleading guilty." *United States v. Tunning*, 69 F.3d 107, 112 (6th Cir. 1995). Without a narrative recitation from the defendant, "when a plea agreement's written description of the essential facts underlying the charge supports a finding of guilty, the defendant's express acknowledgement of the accuracy of the agreement's provisions satisfies the requirements set forth in Rule 11[(b)(3)]." *United States v. Baez*, 87 F.3d 805, 810 (6th Cir. 1996) (interpreting a previous version of Rule 11). For "easily understood" crimes, "a summary of the charges in the indictment and an admission by the defendant" can be "sufficient to establish a factual basis." *United States v. Williams*, 176 F.3d 301, 313 (6th Cir. 1999) (quoting *United States v. Edgecomb*, 910 F.2d 1309, 1313 (6th Cir. 1990)).

Testimony from other parties can also help establish a factual basis. For example, witness testimony can assist in providing a factual basis. *See Bennett*, 291 F.3d at 897. So too can "a statement on the record from the government prosecutors." *Baez*, 87 F.3d at 809 (quoting *United States v. Goldberg*, 862 F.2d 101, 103 (6th Cir. 1988)).

Finally, record documents can also help provide the factual basis for a plea agreement. We have repeatedly considered a defendant's PSR to confirm that a factual basis existed below. *See, e.g.*, *Mobley*, 618 F.3d at 547; *Bennett*, 291 F.3d at 896–97; *United States v. Byrd*, 220 F. App'x 421, 423–24, 427 (6th Cir. 2007). And we can consider charging documents. *See, e.g.*, *United States v. Rothrock*, 617 F. App'x 511, 515–16 (6th Cir. 2015) (per curiam); *United States v. Carillo*, 860 F.3d 1293, 1305–07 (10th Cir. 2017) (finding no factual basis after considering the indictment, the prosecutor's statements, and the PSR); *United States v. Hughes*, 726 F.3d 656, 660–61 (5th Cir. 2013) (finding a factual basis after reviewing the indictment and transcript of the change-of-plea hearing); *see also* 5 WAYNE R. LAFAVE, ET AL., CRIMINAL PROCEDURE § 21.4(f) (4th ed. 2020) ("anything appearing on the record" can establish a factual basis, including a "complaint" or an "indictment").

Pitts contests the factual basis of his plea. He emphasizes that at his initial change-of-plea hearing, he said he never attempted to provide support to al-Qaeda, only to a "Muslim brother." (R.60, First Change-of-Plea Hr'g, at PID#388–89.) And in his allocution during sentencing, he stated he was "not a terrorist. I am not part of no organization." (R.68, Sentencing, at PID#513.)

Despite Pitts's protestations, there was no error. The operative change-of-plea proceedings, the PSR, and the affidavit attached to the criminal complaint provide a factual basis for Pitts's guilty plea. These sources establish that Pitts intended to provide material support—including his personal efforts—to al-Qaeda, that Pitts knew al-Qaeda had engaged in terrorism, and that he had made substantial steps toward commission of the crime. *See United States v. Alebbini*, 979 F.3d 537, 546 (6th Cir. 2020).[3]

A defendant's acknowledgement that his plea agreement accurately describes his conduct is generally enough to satisfy Rule 11's factual basis requirement. *Baez*, 87 F.3d at 810. In the operative plea agreement here, Pitts stipulated that he traveled to Cleveland to take pictures and videos of landmarks to target in a terrorist attack, that he threatened both the President and the First Family, that he coordinated a potential vehicle purchase with the UA for moving a bomb, and that he raised the possibility of a second attack in Philadelphia. Pitts initialed every page of the plea, which he also signed and dated. Pitts then acknowledged his plea agreement's accuracy both when he changed his plea and again, to a lesser extent, at sentencing.

Compare, for example, Pitts's case with *Baez*. Pitts speaks fluent English and obtained an associate's degree. Baez couldn't even read his own plea agreement; a court-appointed interpreter read it to him before he signed it. *Baez*, 87 F.3d at 810. At Baez's plea hearing, the court only elicited two affirmative responses from Baez about the plea's factual basis before accepting the plea. *Id.* at 807. But we determined that that was enough. Here, the three minutes and nine questions the district court spent with Pitts during his change-of-plea hearing confirming that Pitts agreed with his plea's narrative description clears this bar. Thus, Pitts's acknowledgment of the factual basis for the plea agreement, both through his admissions on the record and by signing and initialing each page of the written agreement, established a factual basis for his plea.

---

[3]We decided *Alebbini* after Pitts had entered his plea agreement. And there is some discrepancy between how we defined the elements of § 2339B(a)(1) there and the way the parties defined them in Pitts's plea. *Compare* (R.43, Plea Agreement, at PID#262), *with Alebbini*, 979 F.3d at 546. But Pitts doesn't contest the elements of his plea agreement, nor could he, given the appellate waiver. And, in any event, the record establishes a factual basis for either set of elements, so the difference is immaterial.

And if there were any doubt, other evidence in the record makes the factual basis clear. Pitts's PSR fleshes out his criminal conduct. That report includes quotations from recorded conversations in which he threatened the President and First Family, endorsed jihad training videos over social media, and expressed a desire to conduct a terrorist attack on behalf of al-Qaeda. It also notes that the State Department designated al-Qaeda as an FTO back in 1999 and that Pitts knew al-Qaeda engaged in terrorism.

Finally, the affidavit attached to the government's criminal complaint includes excerpts of recorded conversations between Pitts and a UA. The affidavit reveals that Pitts and the UA explicitly discussed the UA's feigned connection to al-Qaeda: "[p]art of the in and out is understanding what al Qaeda is about . . . any brother that's gonna be in al Qaeda has to be willing to do all the things that we've already talked about." (R.1-1, Wilson Aff., at PID#11.) The UA suggested Pitts could "build trust by steps" and that al-Qaeda was likely "willing to send a brother out to meet you," but that he would first have to "go back and convince" them to work with Pitts. (*See id.*) Undeterred, Pitts asked "When can I meet him?" (*Id.*) The affidavit thus provides additional evidence of Pitts's crimes.

So between Pitts's acknowledgment of his plea agreement, the PSR, and the affidavit attached to the criminal complaint, there was a factual basis in the record for Pitts's guilty plea. Pitts has not established error.

*Competency*. Pitts's second argument—that he was incompetent to enter his plea—turns on his past mental health problems, the fact that his medications had changed in prison, and the time lapsed between his initial competency evaluation and the entry of his plea.[4] A competency challenge implicates the district court's statutory obligation to order a competency determination "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent." 18 U.S.C. § 4241(a).

---

[4]The government contends that Pitts is not challenging the trial court's competency ruling. But the government's brief addresses these facts, attributing to Pitts a "claim that the district court plainly erred by not paying more attention to his physical and mental health issues." (Appellee's Br. at 39.) We believe that Pitts is raising a competency challenge, albeit imprecisely.

The test for competency of a represented party, either to stand trial or to enter a guilty plea, is whether a defendant has "sufficient ability to consult with his lawyers and a reasonable degree of rational and factual understanding of the proceedings against him." *United States v. Denkins*, 367 F.3d 537, 547–48 (6th Cir. 2004) (quoting *United States v. Ford*, 184 F.3d 566, 580 (6th Cir. 1999)); *see also Coe v. Bell*, 209 F.3d 815, 826 (6th Cir. 2000) (citing *Godinez*, 509 U.S. 398) ("[T]he competency standard for pleading guilty or for waiving the right to trial is the same as the competency standard for standing trial."); *Indiana v. Edwards*, 554 U.S. 164, 174–78 (2008). "[T]he district court has not only the prerogative, but the duty, to inquire into a defendant's competency whenever there is reasonable cause to believe that the defendant is incompetent." *United States v. Heth*, 338 F. App'x 489, 497 (6th Cir. 2009) (quoting *Denkins*, 367 F.3d at 545); *see* 18 U.S.C. § 4241. Because Pitts did not object to the plea colloquy, we review the district court's competency determination for plain error. *Heth*, 338 F. App'x at 497 (citing *Denkins*, 367 F.3d at 545).

Pitts asked for and received a competency evaluation before his first arraignment. A forensic psychologist considered Pitts's past and present mental health and determined he was competent to stand trial. Both the magistrate judge and district judge adopted this determination. In at least six court proceedings stretched over sixteen months, neither Pitts, his attorney, nor the prosecutor ever objected to the report's conclusion.

In short, Pitts fails to show that the district court ought to have reconsidered his competency. For starters, the only professional opinion in the record, which the district court arranged at Pitts's counsel's request, found Pitts competent. *See Denkins*, 367 F.3d at 547; *see also United States v. Lebron*, 76 F.3d 29, 32 (1st Cir. 1996) ("If a psychiatrist has determined that a defendant is competent, a court is not required to hold a further evidentiary hearing absent extenuating circumstances."). And, to be sure, at the hearing where Pitts pleaded guilty, he advised the court that the prison wasn't providing him with several medications he had been taking before his arrest. But he also responded affirmatively when the court asked him if he was clear-headed. A defendant's "testimony that he was not currently taking medication" is not, alone, enough to require more competency proceedings when the defendant had been found

competent by a psychologist and was engaged during his change-of-plea hearing. *Heth*, 338 F. App'x at 497.

The record is devoid of a courtroom exchange, or anything else, that would give the district court "reasonable cause" to consider Pitts incompetent at the time he pleaded guilty. On the contrary, Pitts was consistently engaged. At his first arraignment, he asked the court to pause so he could find his copy of the indictment. He asked to swear on a Qur'an rather than a Bible during his first change-of-plea hearing. Later in that proceeding, he interrupted the court six times, including to dispute the plea agreement's description of his conduct. He helped his attorney prepare objections to the PSR. And he challenged the difference between his maximum criminal exposure and the applicable Guideline range's upper bound at his second change-of-plea hearing and again at his sentencing. The prosecutor explained the discrepancy, and both she and the district judge recognized that Pitts had asked a "[v]ery good question." (R.72, Second Change-of-Plea Hr'g, at PID#610 (prosecutor); *id.* at PID#611 (district judge).) So the district court had plenty of reason, including, but not limited to, Pitts's remarks at the operative change-of-plea hearing, to find Pitts competent to plead guilty. Pitts has not shown that the district court erred.

*Understanding of the Charges and the Appellate Waiver.* Pitts's third argument is that he did not knowingly enter his plea. He says that the proceedings below show that he did not understand the charges against him or the terms of his appellate waiver.

"A guilty plea is valid if it is entered knowingly, voluntarily, and intelligently by the defendant." *United States v. Webb*, 403 F.3d 373, 378 (6th Cir. 2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)). "Rule 11 requires that a district court verify the defendant's plea is voluntary and that the defendant understands his or her applicable constitutional rights, the nature of the crime charged, the consequences of the guilty plea, and the factual basis for concluding that the defendant committed the crime charged." *Id.* at 378–79. These strictures are "meant to ensure that the district court is satisfied that the defendant's plea is knowing, voluntary, and intelligent." *Id.* at 378. Because Pitts did not object to the plea colloquy, we review for plain error. *Id.*

Pitts's plea agreement and plea colloquy make clear that he understood the charges against him and the plea's consequences. "Assuring that there is a sufficient factual basis is intimately related to the question of whether the plea is entered into knowingly." *Goldberg*, 862 F.2d at 109. As explained above, this record presents a sufficient factual basis for Pitts's plea. Indeed, Pitts's signed plea reflects his personal "agree[ment] that the following summary fairly and accurately sets forth Defendant's offense conduct and a factual basis for the guilty plea." (R.43, Plea Agreement, at PID#266.)

Besides that, at Pitts's second change-of-plea hearing, the district court reminded him that he was pleading guilty to three felonies. His plea, then, could lead to the loss of certain civil rights, like the ability to vote or serve on a jury. Pitts said he understood. The district court then had the prosecutor state the specific crimes and their maximum penalties on the record. After each individual count, the district court cut in and asked, "Mr. Pitts, do you understand that?" (R.72, Second Change of Plea Hr'g, at PID#603–04.) All three times, Pitts responded that he did. A criminal defendant is bound by the answers he gives when "the court has scrupulously followed the required procedure" for a properly conducted plea colloquy. *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986). For these reasons, Pitts has not shown that the district court plainly erred by concluding that Pitts understood the charges against him.

Pitts's next argument is that he did not knowingly accept his appellate waiver because he twice stated that he didn't want to give up his appellate rights. "We look to the plea colloquy and the written agreement to determine if the waiver was knowing." *United States v. Carter*, 814 F. App'x 1000, 1006 (6th Cir. 2020) (citing *United States v. Swanberg*, 370 F.3d 622, 626 (6th Cir. 2004)). Here, under the heading "Waiver of Appeal and Post-Conviction Attack," Pitts stipulated that he "expressly and voluntarily waive[d]" his appellate rights, except for the right to appeal sentences above the agreed-upon sentence or the statutory maximums. (R.43, Plea Agreement, at PID#265.) More broadly, he "initialed each page of the agreement to signify that [he] underst[oo]d and approve[d] the provisions on that page." (*Id.* at PID#271.) This is as true for Pitts's appellate waiver as it was for his factual basis.

The plea colloquy confirms Pitts's understanding and approval. The district court advised Pitts that his plea agreement gave up a "substantial portion" of his appellate rights. And after the attorneys explained the exact contours of the appellate rights Pitts retained, the district court checked with Pitts to make sure he understood before moving on. Pitts's answer, "Yes, sir," is binding. *See Baker*, 781 F.2d at 90.

Granted, Pitts complained about his lost appellate rights at his first change-of-plea hearing and again at sentencing. But both times, the district court and attorneys explained to him exactly which appellate rights he maintained. Pitts accepted these explanations and never suggested that he wanted to reject the plea agreement because of its appellate waiver. This is never more clear than at the operative change-of-plea hearing, where the prosecution and Pitts's counsel explained his limited appellate rights, which Pitts said he understood. The record therefore shows that Pitts understood the effects of the appellate waiver. So Pitts has not shown that the district court plainly erred by finding the same.

B.

Pitts next challenges his sentence's procedural reasonableness. But his plea agreement prevents him from challenging his sentence except in two circumstances. First, Pitts can appeal a sentence exceeding the statutory maximum. Second, Pitts can appeal a sentence greater than what he and the government agreed to in his plea.

Neither exception applies here. The district court sentenced Pitts to the 168 months to which he and the government agreed. And this sentence is less than half the stacked statutory maximums of 360 months. So Pitts's plea agreement waived his right to appeal his agreed-to sentence.

Because his plea agreement is valid, we cannot address Pitts's contention that his sentence is procedurally unreasonable. *See, e.g.*, *United States v. Sharp*, 442 F.3d 946, 949–52 (6th Cir. 2006) (enforcing an appellate-waiver provision after concluding that the defendant knowingly and voluntarily agreed to it); *United States v. Ash*, 838 F. App'x 972, 974–76 (6th Cir. 2021) (finding a procedural reasonableness challenge to a sentence barred by a valid plea

agreement's appellate waiver after affirming that the plea agreement had a sufficient factual basis).

IV.

We **AFFIRM**.